# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Richard H. Tholen,            Civil No. 17-3919 (DWF/SER)

           Plaintiff,

v.            **MEMORANDUM**
           **OPINION AND ORDER**

Assist America, Inc.,

           Defendant.

_____

Emily E. Niles, Esq., Patrick M. Arenz, Esq., and Ronald J. Schutz, Esq., Robins Kaplan LLP, counsel for Plaintiff.

Joanna Lee Storey, Esq., Mark T. Berhow, Esq., and Robert J. Romero, Esq., Hinshaw & Culbertson LLP, counsel for Defendant.

_____

## INTRODUCTION

This is a personal injury dispute over whether Plaintiff Dr. Richard H. Tholen ("Tholen") suffered injury and other damages due to Defendant Assist America's ("Assist America") failure to provide emergency medical evacuation services pursuant to the insurance policy Tholen purchased through his membership in American Medical Association Insurance. The parties dispute whether Assist America owed a duty of care to Tholen, and, if so, whether Assist America breached its duty. The Court now considers Assist America's motion for summary judgment. (Doc. No. 161.) For the reasons set forth below, the Court denies the motion.

# BACKGROUND

The underlying facts of this case have been detailed in previously issued orders and will not be exhaustively addressed here.[1] Tholen is a board-certified, nationally recognized plastic surgeon. (Doc. No. 96 ("Am. Compl.") ¶ 14.) Assist America is a membership-based organization in the business of providing global emergency medical services, including "emergency medical evacuation" if a member cannot receive adequate care locally. (Am. Compl. ¶¶ 1, 23.) Tholen was an Assist America member in 2015. (*Id.* ¶ 21.)

According to its description to members of its services, "if adequate medical facilities are not available locally, Assist America will use whatever mode of transport, equipment and personnel necessary to evacuate a member to the nearest facility capable of providing a high standard of care." (*Id.* ¶ 23.) To its employees, Assist America says its services include "quickly connecting [members who call in] with capable health care professionals who comply with U.S. quality healthcare standards." (*Id.* ¶ 27.) Among its "key services," Assist America lists "medical consultation, evaluation [and] referral" provided through calls to its "Operations Center" that are "evaluated by medical personnel and referred to English-speaking, Western-trained doctors and/or hospitals."

---

[1] Both parties have presented abundant allegations of fact, not all of which are disputed. Because the matter before the Court is a motion for summary judgment, for which the rule is that all disputed facts must be construed in the light most favorable to the nonmovant, the facts set forth in this section are primarily derived from the nonmovant Tholen's submissions.

(Doc. No. 165 ("Berhow Decl."), Ex. 2 at 3.)  Assist America claims its Operations

Center "is staffed 24/7 by medically-certified, multilingual personnel who can make

immediate recommendations for any emergency situation."  (Berhow Decl., Ex. 3 at 4.)

Assist America further states that "[w]hen a call comes in, [Operations Center staff] put

in motion Assist America's vast English-speaking, Western-quality provider network to

solve medical and non-medical emergencies anywhere in the world."  (*Id.*)

Tholen attempted to use Assist America's services in April 2015 after he severely

injured his right knee ziplining during a vacation in Mazatlán, Mexico on April 19.  (Am.

Compl. ¶¶ 31-32.)  Tholen was taken first to a small clinic for treatment, where x-rays

were taken of his leg and a doctor placed a hard cast on his right leg from groin to toe

despite Tholen's expressed concerns about doing so when he had a severe dislocation and

x-rays showing fibular fracture.  (*Id.* ¶ 33.)  Tholen and his wife, Mary Jane "Sami"

Tholen ("Mrs. Tholen"), who is herself a registered nurse, called an orthopedic surgeon

in the Tholen's home state of Minnesota "for guidance" who advised that the full leg cast

was not the appropriate treatment for Tholen's injury and needed to be removed.  (*Id.*

¶¶ 5, 35-36.)

The Tholens went to Hospital Marina Mazatlán (the "Hospital") for additional

care.  (*Id.* ¶ 36.)  The first doctor Tholen saw did not agree to remove the cast but did

agree to have an orthopedic traumatologist assess Tholen's injury.  (*Id.* ¶ 37.)

Dr. Christian Jesus Lopez Rodriquez ("Dr. Lopez"), an orthopedic traumatologist, agreed

that the cast should be removed.  (*Id.*)  After removing the cast through a "long and

painful" process during which Hospital staff had trouble finding and operating the cast

saw, the doctors at the Hospital sent Tholen back to his hotel for the night and told him to return for follow-up care with Dr. Lopez the next night. (*Id.* ¶ 38.) Neither the clinic nor the Hospital gave Tholen any narcotic or prescription-strength pain medications at any point during his treatment. (*Id.* ¶¶ 33, 38.)

Tholen e-mailed Assist America from the Hospital on April 19 to inquire about "the availability of transfer home." (Doc. No. 216 ("Pl. Opp. Mem.") at 10.) Tholen described his injury as a "high energy fracture dislocation," adding that an x-ray confirmed the presence of a "proximal fibular spiral fracture." (*Id.*) He wrote that he was taken to a clinic for x-rays and "circumferential casted." (*Id.*) Tholen detailed that his toes were numb after the injury, with less sensation at the time the message was written, and that when Tholen had asked the treating physician about compartment and swelling concerns, the physician was unconcerned. (*Id.*) Tholen reported that he was still experiencing "lots of pain" after his initial care so he called his doctor friend, who advised him to have the cast bivalved and get home as soon as possible to "check for intimal vessel tear." (*Id.*) Tholen noted that he is himself a surgeon, and gave his contact information as well as information on his age and his general health. (*Id.*) Finally, Tholen told Assist America that he was "scared." (*Id.*)

Mrs. Tholen also contacted Assist America by phone that day, placing a call from the Hospital that was answered by medical coordinator Clifton Sukhu ("Sukhu").[2] (Am. Compl. ¶ 65.) Sukhu graduated from a Hungarian medical school and is licensed to

---

[2]      While only one transcript is cited here, the Court has listened to and considered all audio recordings submitted by both parties.

practice in Hungary (Doc. No. 163 ("Def. Mem.") at 6-7) but has never practiced medicine and is not licensed to practice medicine in the United States. (Am. Compl. ¶¶ 67-68.) Mrs. Tholen provided the name and location of the Hospital as well as the name of the treating physician, Dr. Lopez. (Pl. Mem. Opp., Ex. 76 ("First Call Transcript") at 3:5-17.) Sukhu told Mrs. Tholen that his clinical team, who were "all medical professionals," would need to speak with Dr. Lopez and would also need to review medical records to "understand exactly what we are dealing with and the best services we can provide to your spouse." (First Call Transcript at 3:23-27.) When Mrs. Tholen asked if this requirement could be met simply by speaking with Dr. Lopez or if she needed to somehow send records to Assist America, Sukhu replied that they would speak to Dr. Lopez themselves and it would be Dr. Lopez who would need to send treatment information. (*Id.* at 3:28-30, 4:1-2.) Sukhu then spoke with Dr. Lopez through the assistance of an interpreter, as Dr. Lopez did not speak English proficiently enough to discuss the case and Sukhu, like the Tholens, was not fluent in Spanish. (*Id.* at 4:15-23, 17:23-25.)

Sukhu inquired of Dr. Lopez in broad terms, asking if the Hospital could "treat [Tholen] for his condition." (*Id.* at 5:21-22.) Dr. Lopez said, "[y]es, of course." (*Id.* at 5:23.) Sukhu then asked if Tholen was asking to be transferred, to which Dr. Lopez responded, "I think it would be [Tholen's] preference because we are already treating him here." (*Id.* at 5:26-28, 6:5-6.) From this answer, Sukhu concluded Tholen was "receiving appropriate treatment." (*Id.* at 6:10.) Sukhu went on to say he "wanted to confirm that your hospital has an orthopedic surgery team and appropriate treatment for

[Tholen]." (*Id.* at 6:11-12.) The interpreter asked if "they have orthopedists and orthopedic surgeons to treat [Tholen]," to which Dr. Lopez responded: "That is correct." (*Id.* at 6:15-18.)

Sukhu told Dr. Lopez, "I'm also a medical doctor and our service is to assist the member if the hospital cannot treat the member appropriately," which the interpreter translated to Dr. Lopez as "Doctor Cliff is currently a medical doctor of medicine, too" and added that Assist America would "help patients return to their home . . . if for some reason they are not being treated . . . but at this time [Tholen] is being treated precisely for his condition." (*Id.* at 6:21-30.) Sukhu told Dr. Lopez that he was going to encourage the Tholens to stay at the Hospital for treatment. (*Id.* at 7:6-7.) Sukhu asked Dr. Lopez if he would be the physician treating Tholen in the emergency room that night, to which Dr. Lopez answered, "No, I am a trauma doctor." (*Id.* at 7:21-24.) The interpreter relayed the message: "Oh, he is a trauma doctor." (*Id.* at 7:25.) To this, Sukhu responded: "Perfect, perfect. Okay, alright." (*Id.* at 7:26-27.) Upon further questioning from the interpreter, Dr. Lopez said that he would in fact be Tholen's treating physician. (*Id.* at 7:28-8:3.)

Sukhu asked to speak with Mrs. Tholen again, and reported that he had explained to Dr. Lopez that he (Sukhu) was also a medical doctor. (*Id.* at 8:25-28.) Mrs. Tholen replied, "Oh, good." (*Id.* at 8:29.) Sukhu told Mrs. Tholen that her husband "currently has a medical emergency," but went on to tell her that Tholen was "in a very good hospital," with a "treating team" that had "orthopedic intervention" and could "treat [Tholen] appropriately." (*Id.* at 9:9-15.) Sukhu said that in a case where a member is

being treated appropriately, Assist America would "normally encourage them to stay there . . . instead of us getting involved and trying to move them in an unstable condition and cause more harm." (*Id.* at 9:17-21.)

The Tholens protested, informing Sukhu repeatedly that Tholen's condition involved vascular compromise, that the orthopedist they had consulted by phone was "appalled" that Tholen's injured leg was casted, they were concerned Tholen may have a clot, that he needed an angiogram, that he was concerned that his risks associated with travel would increase if he waited until after he had a surgical procedure, that they were having difficulty communicating due to the language barrier, and that they wanted care of an American standard of care. (*Id.* at 10:3, 10:7-8, 16:9-11, 17:25, 18:14-15, 19:8-9.)

Mrs. Tholen asked Sukhu to speak again with Dr. Lopez and, with the aid of the interpreter, Dr. Lopez told Sukhu it was his understanding that the Tholens wanted to fly home to Minnesota, which, with a direct flight, would take five hours. (*Id.* at 12:27-30, 14:7.) Dr. Lopez said that he recommended keeping Tholen at the hospital for observation for 24 to 48 hours, and that Tholen's leg was "very swollen." (*Id.* at 14:8-14.)

Sukhu told Mrs. Tholen that if it was her decision and her choice to return home tomorrow, Assist America would not provide that service. (*Id.* at 14:30, 15:1-6.) When she asked what kind of situation would be covered, Sukhu replied that Assist America would "medically monitor" Tholen's inpatient stay, and that Assist America speaks with "treating teams," and obtains medical records to "make sure our members are receiving appropriate treatment that is western [sic] level of care, the same level of care that is

received here in the United States." (*Id.* at 15:11, 15:17-23.)  Sukhu warned against medical evacuation, telling Mrs. Tholen that "[m]oving a member puts them at risk.  It is a liability and it is endangering the patient." (*Id.* at 15:25-27.)  At one point in the approximately 25-minute long call, Mrs. Tholen asked, "What can I say that will make you let us come home?" (*Id.* at 16:25.)  Sukhu answered, "My clinical director will not allow it.  And I can bring all my clinical directors on the phone to speak with you." (*Id.* at 16:26-28.)

The Tholens continued to request assistance, repeating their concerns including that a trusted orthopedic surgeon had advised them to return home, their inability to communicate with healthcare providers, and that Tholen needed an angiogram and may have vascular compromise. (*Id.* at 17:19-21, 17:23-25, 18:7-10, 18:15, 19:8-9.)  Sukhu told them that he knew the Hospital was "more than capable" of providing appropriate treatment because Dr. Lopez told him so (*id.* at 17:3-6), and could provide Tholen with "both vascular and orthopedic type treatment" (*id.* at 19:14).  Speaking to Tholen, Sukhu told him that "[Sukhu's] clinical team here are specialists in site physiology and understand the dynamics of changes," and that Assist America moves members with traumas, "but if a member is in an appropriate facility . . . we don't move him because it is a liability; it is a risk." (*Id.* at 19:21-24, 20:14-17.)  Near the end of the phone call, Tholen told Sukhu, "we will have to make other arrangements then because I am not going to stay." (*Id.* at 20:19-20.)

Sukhu's supervisor Matthew Pasternak ("Pasternak"), who is not a doctor, reviewed the audio recording of the April 19, 2015 call more than eight hours later.  (Am.

8

Compl. ¶ 78.)  After this review, Sukhu closed Tholen's case in Assist America's case management system.  (*Id.* ¶¶ 78, 80.)  Neither Sukhu nor Pasternak consulted a clinical director before the Tholen case was closed in Assist America's system.  (*Id.* ¶ 80.)

Tholen was not admitted overnight for observation but returned to the Hospital on April 20, 2015.  (*Id.* ¶¶ 103, 106.)  Mrs. Tholen again called Assist America to ask that they provide emergency evacuation, this time speaking with medical coordinator Carl Logsdon ("Logsdon").  (*Id.* ¶¶ 106, 108.)  Logsdon spoke with Dr. Lopez but did not ask if Tholen was at risk for compartment syndrome, if he had been evaluated for a vascular injury, if an angiogram had been performed, or what treatments Tholen had received so far or would need in the future.  (*Id.* ¶¶ 113-14.)  Mrs. Tholen called Assist America again, informing Logsdon that Tholen was being released from the Hospital and requesting assistance.  (*Id.* ¶ 115.)  Logsdon refused again, telling Mrs. Tholen that "Assist America does not repatriate members from places that are able to provide the necessary care."  (*Id.* ¶ 116.)

Mrs. Tholen bought tickets for the first commercial flights available, and the Tholens left Mazatlán on April 21, 2015, arriving in Minnesota after a layover early in the morning of April 22, 2015.  (*Id.* ¶ 147.)  Meanwhile, Assist America's clinical directors and chief medical director reviewed Tholen's case on April 21 and determined that it would be safe for Tholen to travel but that whether Assist America should provide emergency evacuation services would be "an administrative decision."  (*Id.* ¶ 136.)

Tholen underwent multiple surgical procedures over several weeks, and eventually his injured right leg was amputated above the knee.  (*Id.* ¶¶ 151-53.)  Tholen has since

required "extensive rehabilitation," "significant pain and suffering, financial loss, and loss of enjoyment in a number of activities," affecting his daily life, medical/surgical practice, and physical and mental state. (*Id.* ¶ 154.) Tholen filed suit against Assist America on August 24, 2017, asserting claims of negligence, breach of contract implied-in-fact, and breach of contract–third party beneficiary. (Doc. No. 1.)

On August 13, 2018, United States Magistrate Judge Steven E. Rau issued an order granting Tholen's second motion to amend his complaint to assert punitive damages in connection with his claims. (Doc. Nos. 95, 87.) The August 13 Order explained that the body of Minnesota caselaw tends to support Tholen's contention that he may pursue both tort and contract claims under the circumstances present. (Doc. No. 95 at 5-6.) The Magistrate Judge found that assuming Tholen's allegations were true, as was required at that stage, the allegations set forth a "parade of horribles, that if proved" would on its face plausibly allege both negligence on Assist America's part in the provision of its professional services as well as willful disregard for Tholen's rights under its care. (*Id.* at 6.) Tholen filed an amended complaint, elaborating upon his claims and adding his request for punitive damages. (Am. Compl.) Assist America's appeal of Magistrate Judge Rau's August 13 order was overruled on October 17, 2018, and the order was affirmed. (Doc. No. 122.) As the Court noted in affirming the order allowing Tholen to seek punitive damages, Tholen's allegations include that Assist America's representatives misrepresented themselves as physicians, that Assist America failed to obtain medical records from the Hospital in order to make an informed decision

about Tholen's medical care, and that the proper clinical directors were not contacted or declined to review Tholen's medical case in a timely manner.  (Doc. No. 122 at 2.)

Assist America requested summary judgment on the grounds that Tholen's negligence claim fails as a matter of law because Assist America owed no duty to Tholen beyond fulfilling the terms of the contract for services, Tholen cannot demonstrate proximate cause, and punitive damages are not available without an independent tort. (Doc. No. 161; Def. Mem.)

Tholen supported his allegations as to standard of care with exhibits including Assist America's representations to customers and internal documents concerning policy and procedure as well as reports from four medical experts.  (*See generally* Doc. No. 217.)  Assist America has maintained that Tholen cannot establish that any action or inaction on its part resulted in the amputation of his leg because it is impossible to pinpoint when the leg could no longer be saved.  (Def. Mem. at 18-19.)

## DISCUSSION

### I.     Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive

determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Negligence

Tholen argues that Assist America voluntarily assumed a duty of care when it entered an agreement to provide him with global emergency services and that it breached this duty by failing either to adequately monitor or investigate the care he received in Mexico or to provide evacuation services when it knew or should have known that Tholen's health was at serious risk.  Assist America contends that, in spite of its own marketing and policy documents offering "emergency medical evacuation," it should not be viewed as a health care practitioner or provider and therefore should not be held to a professional standard for negligence purposes.  Assist America argues that without being held to such a standard, it owes no duty beyond the scope of the contract and, in any case, Tholen cannot demonstrate that Assist America's acts or omissions proximately caused injury to Tholen.  Somewhat contradicting its arguments that it should not be held to a

professional standard, Assist America also attempts to bolster its argument that its conduct does not warrant an award of punitive damages by claiming that "there was no misrepresentation" made regarding Sukhu's qualifications because, they assert, "it was a truthful statement when [he] told Mrs. Tholen he was a medical doctor." (Def. Mem. at 29-30.)

Negligence can be summarized as "the failure to exercise such care as persons of ordinary prudence usually exercise under such circumstances." *Domagala v. Rolland*, 805 N.W. 2d 14, 22 (Minn. 2011) (internal quotations omitted). To prevail in a negligence claim, a plaintiff must prove that a defendant owed a duty, that the duty was breached, that an injury occurred, and that the breach of the duty of care proximately caused the injury. *Id.* The existence of a duty to the plaintiff on the part of the defendant is a "threshold question" in a negligence claim because without a legal duty, the claim fails. *Id.*

### A.    Duty and Breach

Under Minnesota law, a plaintiff cannot recover in negligence without proving breach of a duty that arose independent of a contract. *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 584 (Minn. 2012). The existence of a contract, however, does not preclude the existence of an independent duty. A defendant is liable for harm to a third person when he or she "undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person" and his or her failure to exercise reasonable care in providing the service increases the risk of the harm, or the harm is suffered because of the third person's reliance upon the

undertaking. *Gaudreault v. Elite Line Servs., LLC*, 22 F. Supp. 3d 966, 974 (D. Minn. 2014).

Several possible sources of a duty are implicated in the circumstances presented here. A duty can arise due to a special relationship between the parties, or a defendant can assume a duty of care, and negligence law imposes a general duty of reasonable care upon defendants for their own conduct. Courts consider several factors in determining whether a defendant owed a duty of care, including the foreseeability of harm to the plaintiff, the connection between the defendant's conduct and the injury suffered, the "moral blame attached" to the defendant's conduct, the policy of preventing future harm, and the burden imposed by a duty to exercise care with resulting liability for breach. *Domagala*, 805 N.W. 2d at 26. In short, the existence of a duty depends "on the relationship of the parties and the foreseeable risk involved." *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 168-69 (Minn. 1989).

A defendant owes a "general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Domagala*, 805 N.W.2d at 23. To determine foreseeability of an injury, under Minnesota law the question is whether the specific danger was objectively reasonable to expect, not simply whether it was "within the realm of any conceivable possibility." *Id.* at 26. The "precise nature and manner" of the injury to the plaintiff need not be foreseeable, but rather, courts ask "whether the possibility of an accident was clear to the person of ordinary prudence." *Id.* at 27; *see also Gaudreault*, 22 F. Supp. 3d 974. The general duty imposed upon a defendant is to "exercise the care commensurate with all known or

reasonably foreseeable dangers." *Domagala*, 805 N.W.2d at 28. "Reasonable care" is defined as the "degree of care which a reasonably prudent person would exercise under the same or similar circumstances." *Id.*

Foreseeability is an issue that ordinarily is properly decided by the court before submitting a case to a jury, but in "close cases," the issue of foreseeability should be submitted to the jury. *Id.* at 27. It is a close case, properly resolved by a jury, when viewing the evidence and inferences arising from the evidence in the light most favorable to the plaintiff, reasonable persons might differ as to the foreseeability of the plaintiff's injury. *Montemayor v. Sebright Prod. Inc.*, 898 N.W.2d 623, 625 (Minn. 2017).

Once a duty is assumed, the key is whether a defendant should realize his or her promise or other conduct will cause another to reasonably rely upon their service "and to refrain from taking other and more direct action to protect themselves"— if this is the case, then the defendant is required to exercise reasonable care in performing the duty assumed and liable for a failure to do so. *Abresch v. Nw. Bell Tel. Co.*, 75 N.W.2d 206, 211-12 (Minn. 1956). "Minnesota has long recognized that one who voluntarily assumes a duty must exercise reasonable care or he will be responsible for damages resulting from his failure to do so." *Ironwood Springs Christian Ranch, Inc. v. Walk to Emmaus*, 801 N.W.2d 193, 198 (Minn. Ct. App. 2011) (internal quotation marks omitted). The reasonable care standard does not change, but the degree of care required depends on the circumstances. *Gaudreault*, 22 F. Supp. 3d at 975. The care exercised by a defendant must adequately remedy the harm foreseeable from the defendant's conduct, balancing

the likelihood of harm, and the gravity of the harm if it happens, against the burden of the precaution that would effectively prevent the harm in a given situation. *Id.*

A special relationship can arise when a defendant undertakes, gratuitously or for consideration, to render services to another which that defendant should recognize as "necessary for the protection of a third person or his things," and this defendant will be liable "if (1) his failure to act increases the risk of harm; (2) he undertook a duty owed by the other to the third party; or (3) the harm is suffered because the other or the third person relied on the undertaking." *Bjerke v. Johnson*, 742 N.W.2d 660, 665 (Minn. 2007) (citing *Walsh v. Pagra Air Taxi, Inc.*, 282 N.W.2d 567, 571 (Minn. 1979)). When parties stand in a special relationship, a defendant owes a duty to protect a plaintiff even from action by someone other than the defendant that presents a foreseeable risk of harm. *Domagala*, 805 N.W. 2d at 23. A defendant "who undertakes to render professional services is under a duty to the person for whom the service is to be performed to exercise such care, skill, and diligence as [persons] in that profession ordinarily exercise under like circumstances." *City of Eveleth v. Ruble*, 225 N.W.2d 521, 524 (Minn. 1974). Courts have been reluctant to impose a duty to protect upon business enterprises generally. *United Prod. Corp. of Am. v. Atlas Auto Parts, Inc.*, 529 N.W.2d 401, 404 (Minn. Ct. App. 1995). However, a special relationship and duty to protect will arise when a plaintiff entrusts his or her safety to a defendant, the defendant accepts that entrustment, and the defendant is in a position to protect against the harm. *Id.* at 404; *Erickson*, 447 N.W.2d at 168. It may arise when one accepts responsibility to protect another even where there was no initial duty. *Meyer v. Lindala*, 675 N.W.2d 635, 640

(Minn. Ct. App. 2004). Whether a defendant assumed such a duty and whether the

defendant "failed to exercise reasonable care in the performance thereof involve

questions of fact which cannot be determined on a motion for summary judgment."

*Abresch*, 75 N.W.2d at 212; *see also Ironwood Springs Christian Ranch*, 801 N.W.2d at

198.

      "The standard of care presents a question of law because it defines a legal

obligation to be determined only by the court and from which the jury may not deviate."

*Blatz v. Allina Health Sys.*, 622 N.W.2d 376, 383-84 (Minn. Ct. App. 2001). An ordinary

person is required to do what a reasonable person would do under the same or similar

circumstances, while a person providing professional services is under a duty to exercise

"such care, skill, and diligence as persons in that profession ordinarily exercise under like

circumstances." *Blatz*, 622 N.W.2d at 384.

      Minnesota applies the ordinary standard of care to claims that do not involve

medical expertise and applies the heightened professional standard to medical

professionals "when engaged in conduct requiring medical judgment or training." *Id.* at

384. For statute of limitations purposes, Minnesota courts "typically" distinguish

malpractice by professionals acting pursuant to their professional licensure from

negligence based on conduct for which no professional licensure is required (*id.* at 385),

but the analysis does not always come down to this distinction. *See Henderson v. Allina

Health Sys.*, 609 N.W.2d 7 (Minn. Ct. App. 2000) (finding that the lowering of bed rails

by unidentified hospital employees was a medical judgment within the category of an

action requiring professional licensure because it required an understanding of a patient's

medical needs and medical status and was therefore subject to the shorter medical malpractice statute of limitations).  As the Minnesota Supreme Court recently clarified, "most medical malpractice cases involve an express physician-patient relationship," but the Court has "never held that such a relationship is necessary to maintain a malpractice action."  *Warren v. Dinter*, 926 N.W.2d 370, 375 (Minn. 2019).  When the existence of a physician-patient relationship is in question, courts turn to the "traditional inquiry of whether a tort duty has been created by foreseeability of harm."  *Id.*  "[A] duty arises between a physician and an identified third party when the physician provides medical advice and it is foreseeable that the third party will rely on that advice."  *Id.* at 376.

In defining the scope of professionals' duty and standard for care owed to those served by their profession, Minnesota has moved away from the "mostly subjective 'honest error in judgment' language."  *Ouellette by Ouellete v. Subak*, 391 N.W. 2d 810, 816 (Minn. 1986).  For example, doctors may be found negligent for making choices between treatment options without first getting information needed to make the decision. "[A]n unsuccessful method of treatment chosen because of a failure to use such reasonable care would be negligent."  *Id.*  The professional standard of care, skill, and diligence required can be determined by looking at considerations such as the terms of an agreement between the parties involved, the nature of the problem the service represented itself as being competent to solve, and the effect that could be reasonably anticipated. *Ruble*, 225 N.W.2d at 524.  A determination that a professional has fallen short in providing skilled services for compensation ordinarily requires expert testimony to

establish the prevailing standard and the consequences of departure from that standard. *Id.* at 525; *see also Gaudreault*, 22 F. Supp. 3d at 975.

Here, there is no question that Tholen relied upon Assist America's services and that Assist America was aware of his reliance. Assist America's services are premised upon its members' contacting them for help in emergency situations. Assist America's representative assured the Tholens that they were at a facility that could provide Tholen with appropriate care and did not just refuse to assist with moving him from the Hospital, but also actively discouraged them from moving, cautioning them that in the representative's medical judgment, moving Tholen would put his health at risk.

Crucial elements of a negligence claim remain in serious dispute. While it is clear that Tholen has alleged facts that could reasonably lead to the conclusion that Assist America owed the duty required of medical professionals, the scope of the duty owed remains in question due to the expertise required to resolve the issues related to the standard of care. At oral arguments, this Court asked Assist America why its representatives asked to see the medical records if Tholen was the one who would decide whether he was experiencing a medical emergency and if Assist America made no medical judgment in its decision not to provide a medical evacuation. (*See* Doc. No. 254 ("Motions Hearing") at 8:9-13.) Counsel for Assist America replied that the judgment "made and required under the contract" is whether evacuation is necessary. (Motions Hearing at 8:14-16.) A jury will need to know details not yet developed in the record.

In this case, the circumstances required making medical judgments about what reported and observed symptoms would raise what concerns about what health outcomes,

about all of which the parties' experts disagree strongly.  To reach a conclusion at this stage would require weighing facts and credibility of evidence, which is the role of the finder of fact.  *Montemayor*, 898 N.W.2d at 633.  Summary judgment is therefore inappropriate as to the issue of foreseeability, and consequently the scope of the duty, in this case.

### B.    Proximate Cause of Injury

To prevail in a tort claim, plaintiffs must prove that the breach of a duty of care was the proximate cause of the injury alleged.  *ADT Sec. Servs., Inc. v. Swenson*, 276 F.R.D. 278, 305 (D. Minn. 2011).  There is proximate cause between a negligent act and an injury when the actor ought to have anticipated, by exercising ordinary care, that the act was likely to result in injury to others.  *ADT*, 276 F.R.D. 305.  Determining the existence of proximate cause "is usually a question of fact for the jury," unless the plaintiff cannot "demonstrate a plausible causal linkage between a breach of duty and his or her injuries" so that reasonable minds could only conclude that the negligent act did not proximately cause the injury claimed.  *Id.* at 305-06.  Minnesota law applies the substantial factor test for causation, meaning that the negligent act is a proximate cause of harm if it was a substantial factor in the harm's occurrence.  *George v. Estate of Baker*, 724 N.W.2d 1, 10 (Minn. 2006).  The negligent act is defined by the standard of care required.  *Id.* at 11.  A plaintiff needs more than factual, or but-for, causation to establish liability. *Id.* at 10-11.  However, in order to proceed to trial, the plaintiff only needs to show "a plausible causal linkage between a breach of duty and his or her injuries." *Jonathan v. Kvaal*, 403 N.W.2d 256, 260 (Minn. Ct. App. 1987).

Again, the issues involved in making a final determination require medical expertise, and the Tholens' expert reports strongly connect both the care received in Mexico and the delay in receiving superior care in the United States to Tholen's poor outcome. Although Assist America's experts may persuade a jury otherwise, at this stage it is reasonable to conclude that Assist America caused Tholen's amputation and other related damages by refusing to arrange an emergency evacuation. Consequently, summary judgment as to negligence is inappropriate in this case.

### C.    Punitive Damages

This Court, in affirming Magistrate Judge Rau's order, has already found that Tholen has presented prima facie evidence that Assist America acted with deliberate disregard for the rights or safety of others. (Doc. No. 122.) To succeed at trial in his pursuit of punitive damages, Tholen must show by clear and convincing evidence that Assist America acted with deliberate disregard for the rights or safety of others, which exists when a defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights and safety of others, and deliberately proceeds to act either in conscious or intentional disregard or with indifference of that high probability. *ADT Sec. Servs., Inc. v. Swenson*, 276 F.R.D. 278, 309 (D. Minn. 2011) (citing Minn. Stat. § 549.20, subd. 1(b)).[3]

---

[3]    Minnesota amended Minn. Stat. § 549.20 to replace "willful indifference" with "deliberate disregard" and has applied the new terminology as defined in the statute since the amendment became effective on May 4, 1990. *See, e.g., Olson v. Snap Prod., Inc.*, 29 F. Supp. 2d 1027, 1035-36 (D. Minn. 1998).

Punitive damages are available under Minnesota Statute § 549.20 "upon clear and convincing evidence" that the defendant acted with deliberate disregard for the rights or safety of others. Minn. Stat. § 549.20(1)(a). Deliberate disregard is shown when the actor "has knowledge of facts or intentionally disregards facts that create a high degree of probability of injury to the rights or safety of others," yet deliberately proceeds "to act in conscious or intentional disregard" of this likelihood or "to act with indifference" to it. *Id.*, subd. 1(b). Tholen has cleared this hurdle and met the standard required in order to move forward with his case.

Assist America knew, or should have known, that Tholen faced serious negative health outcomes by delaying proper care. Tholen informed Assist America of a severe injury and many alarming symptoms soon after the injury occurred, and communicated that as a doctor and a patient, he was scared. Assist America responded by assuring Tholen and his wife that they were in a "very good hospital" without verifying the capabilities of the facility or its staff, even going so far as to state that the Hospital could provide both vascular and orthopedic treatment without ever asking the treating doctor about vascular treatment. Through multiple conversations, two Assist America representatives never asked for detailed information about Tholen's condition or treatment, yet they assured the Tholens that not only was the Hospital a place where appropriate care was available, but Tholen would be at risk if he moved. Assist America knew that the Tholens and Hospital staff were unable to speak the same language and acknowledged that Tholen was experiencing a medical emergency. Assist America has consistently argued that their duty is confined to the terms of the contract and that their

policies only provide for evacuation to the nearest appropriate facility, yet when the

Tholens asked many times in many ways what Assist America would be willing to do to

help them, Assist America's representatives never mentioned, much less offered, the

possibility of transport to a closer facility capable of providing a higher quality of care.

As Assist America knew from the course of its communications with the Tholens, this

left the Tholens with the impression that they would not receive any assistance with

transport from Assist America, meaning that their choices were to stay at the Hospital

where they believed Tholen was receiving subpar care or to take their chances with a

commercial flight home. This evidence, if believed by a jury, is more than sufficient to

meet the standard for punitive damages.

## III. Breach of Contract

The elements of a breach of contract claim are: "'(1) formation of a contract;

(2) performance by plaintiff of any conditions precedent to his right to demand

performance by the defendant; and (3) breach of contract by defendant.'" *Carlsen v.

GameStop, Inc.*, 833 F.3d 903, 911 (8th Cir. 2016) (*quoting Park Nicollet Clinic v.

Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)). Minnesota has "recognized that the

plaintiff may not have to allege that the breach caused damages in order to state a claim

for a breach of contract." *Park Nicollet* 808 N.W.2d at 833 n.5. Here, Assist America

does not contend that Tholen failed to perform a condition precedent to receiving the

modification and concedes that Tholen is the intended third-party beneficiary to its

contract with the American Medical Association. (Def. Mem. at 33.) Tholen has shown

facts supported by Assist America's own materials to assert the services to which he was

entitled.  In addition, as this Court has addressed at length, Tholen claims significant damages resulted from Assist America's failure to provide an emergency evacuation. Thus, Tholen has adequately alleged a breach of contract.

## CONCLUSION

The Court finds that issues of fact remain as to negligence and breach of contract. It also finds that Tholen has shown evidence sufficient to advance claims for punitive damages.  Therefore, the Court denies Assist America's motion for summary judgment.

## ORDER

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant Assist America's Motion for Summary Judgment (Doc. No. [161]) is **DENIED.**

Dated:  June 6, 2019                    s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge